*1311 Concurring opinion filed by Circuit Judge MAYER.
Opinion dissenting-in-part filed by Circuit Judge STOLL.
DYK, Circuit Judge.
Intellectual Ventures I LLC (“IV”) sued Symantec Corp. and Trend Micro[1] (together, “appellees” or “defendants”) for infringement of various claims of U.S. Patent Nos. 6,460,050 (“the '050 patent”), 6,073,142 (“the '142 patent”), and 5,987,610 (“the '610 patent”). The district court held the asserted claims of the '050 patent and the '142 patent to be ineligible under § 101, and the asserted claim of the '610 patent to be eligible. We affirm as to the asserted claims of the '050 patent and '142 patent, and reverse as to the asserted claim of the '610 patent.
Background
I
IV owns the three patents at issue: the '050 patent, the '142 patent, and the '610 patent. IV sued Symantec and Trend Micro, two developers of anti-malware and anti-spam software, for infringement of various claims of those patents. Against Symantec, IV asserted claims 9,16, and 22 of the '050 patent; claims 1, 7, 21, and 22 of the '142 patent; and claim 7 of the '610 patent. Against Trend Micro, IV asserted claims 9, 13, 16, 22, arid 24 of the '050 patent; and claims 1, 7, 17, 21, 22, 24, and 26 of the '142 patent.
With respect to the two defendants, a § 101 patent eligibility issue arose at different stages of the proceedings. The case against Symantec went to trial. The jury found that Symantec had not proven by clear- and convincing evidence that any asserted claims were invalid under §§ 102 and 103. The jury found Symantec had infringed the asserted claims of the '142 patent and '610 patent, and had not infringed any asserted claims of the '050 patent.[2] After trial, Symantec brought a motion under Fed. R. Civ. P. 52(c) for a judgment that all the asserted claims of the three patents-in-suit are unpatentable under 35 U.S.C. § 101, an issue not addressed in the jury verdict.
The case against Trend Micro did not go to trial. Trend Micro brought a motion for summary judgment- of invalidity under § 101 for all of the asserted claims.[3] After Trend Motion had submitted its motion, IV withdrew its assertion of claim 7 of the '610 patent against Trend Micro, the only claim of the '610 patent asserted against Trend Micro. Thus the motions raised issues of patent eligibility as to the '050 and '142 patents with respect to both defendants, and as to the '610 patent only with respect to Symantec.
II
The '050 patent is entitled, “Distributed Content Identification System.”-The patent application was filed on December 22, 1999, and the '050 patent issued on October 1, 2002. The patent is directed to methods of screening emails and other data files for unwanted content.
The '142 patent is entitled, “Automated Post Office Based Rule Analysis of E-Mail Messages and Other Data Objects for Con *1312 trolled Distribution in Network Environments.” The patent application was filed- on June 23, 1997, and the '142 patent issued on June 6, 2000. The patent is directed to methods of routing e-mail messages, based on specified criteria (i.e., rules).
The '610 patent is entitled, “Computer Virus Screening Methods and Systems.” The patent application was filed on February 12, 1998, and the patent issued on November 16, 1999. The patent is directed to using computer virus screening in the telephone network.
In both cases the district court determined that the asserted claims of the '050 patent and '142 patent claimed ineligible subject matter under 35 U.S.C. § 101, and granted appellees’ motions with respect to those patents. The district court held, however, that Symantec had failed to establish that the asserted claim of the '610 patent is patent-ineligible under § 101, and denied Symantec’s motion with respect to that patent.
Final judgment was entered in favor of Symantec and Trend Micro that the asserted claims of the '050 and '142 patents are patent-ineligible under 35 U.S.C. § 101. Id. See Final Judgment Following Jury Trial (“Symantec Final Judgment”), Intellectual Ventures I LLC v. Symantec Corp., No. 10-cv-1067-LPS, 2015 WL 4967134 (D. Del. March 24, 2016), ECF No. 770 at 2;[4] Judgment, Intellectual Ventures I LLC v. Trend Micro Inc., No. 12-cv-1581-LPS (D. Del. June 17, 2015), ECF No, 234 at 2. This resolved all .claims against Trend Micro. With respect to Sym-antec, the district couii entered final judgment in favor of IV fiiat Symantec infringed claim 7 of the '610 patént with damages in the amount of $8 million, and that claim 7.was also not proved.invalid by Symantec under 35 U.S.C. §§ 102 or 103, or patent-ineligible under § 101. See Symantec Final Judgment at 2.
IV now appeals the district court’s ineligibility determinations with respect to the '050 patent and '142 patent as to Syman-tec and Trend Micro, and Symantec cross-appeals- the determination of eligibility for the '610 patent. We have jurisdiction under 28 U.S.C. § 1295(a)(1).
Discussion
I
We review the grant or denial of summary judgment de novo. See Nicini v. Morra, 212 F.3d 798, 805 (3d Cir. 2000) (en banc). For the district court’s entry of judgment under Rule 52(c), we review the district court’s factual- findings for clear error and its legal conclusions de novo. See EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 273 (3d Cir. 2010). Patent eligibility under § 101 is an issue of law which we review de novo. See OIP Techs., Inc. v. Amazon.com, Inc., 788 F.3d 1359, 1362 (Fed. Cir. 2015).
II
Section 101 of title 35 defines patent-eligible subject matter. It provides, “[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor....” 35 U.S.C. § 101. For over 150 years, the Supreme Court has recognized an implicit exception to these broad categories encompassing “[l]aws of nature, natural phenomena, and abstract ideas[, which] are not patentable.” Mayo Collaborative Servs. v. Prometheus Labs., Inc., — U.S.-, 132 S.Ct. 1289, 1293, 182 L.Ed.2d 321 (2012) (citation and inter *1313 nal quotation marks omitted); see also Bilski v. Kappos, 561 U.S. 593, 601-02, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010).
In Mayo and in Alice, the Court set forth a framework for “distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts.” Alice Corp. Pty. Ltd. v. CLS Bank Int’l, — U.S.-, 134 S.Ct. 2347, 2355, 189 L.Ed.2d 296 (2014). At Mayo/Alice step one, a court must “determine whether the claims at issue are directed to one of those patent-ineligible concepts.” Id. The category of abstract ideas embraces “fundamental economic practiced] long prevalent in our system of commerce,” id. at 2356 (quoting Bilski, 561 U.S. at 611, 130 S.Ct. 3218), including “longstanding commercial practice^]” and “method[s] of organizing human activity,” id. But the category of abstract ideas is not limited to economic or commercial practices or methods of organizing human activity. See infra.
If a claim is directed to a patent-ineligible concept, the court must proceed to Mayo/Alice step two, and ask, “what else is there in the claims before us?” Alice, 134 S.Ct. at 2355 (citation and internal quotation citation omitted). Step two is “a search for an inventive concept—i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.” Id. (citation and internal quotation marks omitted).
At Mayo/Alice step two, the search is for “an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application.” Id. at 2357 (citation and internal quotation marks omitted). And “[s]imply appending conventional steps, specified at a high level of generality,” which are “well known in the art” and consist of “well-understood, routine, conventional activities]” previously engaged in by workers in the field, is not sufficient to supply the inventive concept. Id. at 2357, 2359 (citations and internal quotation marks omitted).
1, The '050 Patent
The district court held patent-ineligible the asserted claims of the '050 patent— claims 9, 13, 16, 22, and 24—directed to filtering e-mails that have unwanted content. We agree with the district court. The parties agree that independent claim 9 is representative. It recites’:
9. A method for identifying characteristics of data files, comprising:
receiving, on a processing system, , file content identifiers for data files from a plurality of file content identifier generator agents, each agent provided on a source system and creating file content IDs using a mathematical algorithm, via a network;
determining, on the processing system, whether each received content identifier matches a characteristic of other identifiers; and ’
outputting, to at least one of the source systems responsive to a request from said source system, an indication of the characteristic of the data file based on said step of determining.
'050 patent, col. 8, 11. 13-26. According to IV, this method of filtering emails is used to address the problems of spam e-mail and the use of e-mail to deliver computer viruses.
We agree with the district court that receiving ’e-mail (and other data file) identifiers, characterizing e-mail based on the identifiers, and communicating the characterization—in other words, filtering files/e-mail—is an abstract idea.
*1314 The Supreme Court has held that “fundamental ... practiced] long prevalent” are abstract ideas. Alice, 134 S.Ct. at 2356. The Supreme Court and we have held that a wide variety of well-known and other activities constitute abstract ideas.[5]
Here, it was long-prevalent practice for people receiving paper mail to look at an envelope and discard certain letters, without opening them, from sources from which they did not wish to receive mail based on characteristics of the mail.[6] The list of relevant characteristics ■ could be kept in a person’s head. Characterizing email based on a known list of identifiers is no less abstract. The patent merely applies a well-known idea using generic computers “to the particular technological environment of the Internet.” DDR Holdings, LLC v. Hotels.com, L.P., 773 F.3d 1245, 1259 (Fed. Cir. 2014).
The asserted claims of the '050 patent also resemble claims we have held were directed to an abstract idea. Recently, in BASCOM Global Internet Services, Inc. v. AT&T Mobility LLC, we held that a claim to a “content filtering system for filtering content retrieved from an Internet computer network[, e.g., to prevent users from accessing certain websites] ... is [directed to] an abstract idea.” 827 F.3d 1341, 1348 (Fed. Cir. 2016).[7] And in Content Extraction, 776 F.3d at 1347, cert. denied, — U.S.-, 136 S.Ct. 119, 193 L.Ed.2d 208 (2015), we found that the asserted patents were “drawn to the abstract idea of 1) *1315 collecting data, 2) recognizing certain .data within the collected data set, and 3) storing that recognized data in a memory.”
Because we hold the asserted claims of the '050 patent are directed to an abstract idea, we proceed to Mayo/Alice step two to determine whether the claims contain an “inventive concept” that renders them patent-eligible. Claims that “amount to nothing significantly more than an instruction to apply [an] abstract idea ... using some unspecified, generic computer” and in which “each step does no more than require a generic computer to perform generic computer functions” do not make an abstract idea patent-eligible, Alice, 134 S.Ct. at 2359-60 (citations and internal quotation marks omitted), because “claiming the improved speed or efficiency inherent with applying the abstract idea on a computer” does not “provide a sufficient inventive concept,” Intellectual Ventures I LLC v. Capital One Bank (USA) (“Intellectual Ventures v. Capital One Bank”), 792 F.3d 1363, 1367 (Fed. Cir. 2015).
IV argues that the jury verdict determined that Symantec’s proffered pri- or art did not anticipate or render obvious the asserted claims of the '050 patent, and that the jury’s anticipation and obviousness determination is inconsistent with a determination that the claims are patent-ineligible. While the claims may not have been anticipated or obvious because the prior art did not disclose “determining ... whether each received content identifier matches a characteristic” or “outputting ... an indication of the characteristic of the data file,” that does not suggest that the idea of “determining” and “outputting” is not abstract, - much less that its implementation is not routine and conventional.
Indeed, “[t]he ‘novelty’ of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject' matter of a claim falls within the § 101 categories of possibly patentable subject matter.” Diamond v. Diehr, 450 U.S. 175, 188-89, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981) (emphasis added); see also Mayo, 132 S.Ct. at 1303-04 (rejecting “the Government’s invitation to substitute §§ 102, 103, and 112 inquiries for the better established inquiry under § 101”).[8] Here, the jury’s general finding that Symantec did not prove by clear and convincing evidence that three particular prior art references do not disclose all the limitations of or render obvious the asserted claims does not resolve the question of whether the claims embody an inventive concept at the second step of MayolAlice.
The steps of the asserted claims of the '050 patent do not “improve the functioning of the computer itself,” Alice, 134 S.Ct. at 2359, for example by disclosing an “improved, particularized method of digital data compression,” DDR Holdings, 773 F.3d at 1259, or by improving “the way a computer stores and retrieves data in memory,” Enfish, LLC v. Microsoft Corp., 822 F.3d 1327, 1339 (Fed. Cir. 2016). Rather, these claims use generic computers to perform generic computer functions.
. In Intellectual Ventures v. Capital One Bank, we found abstract an. Internet-based method for “tracking financial transactions to determine whether they exceed a preset spending limit (i.e., budgeting).” 792 F.3d at 1367. The fact that “the claims *1316 recite[d] budgeting using a ‘communication medium’ (broadly including the Internet and telephone networks), ... [did] not render the claims any less abstract.” Id. We also found abstract claims related to “customizing [website] information based on (1) information known about the user and (2) navigation data,” and similarly held that “a generic web-server with attendant software ... ‘tasked with tailoring information and providing it to the user’ provides no additional limitation beyond applying an abstract idea, restricted to the Internet, .on a generic computer.” Id. at 1370-71.
The claims .here are also distinguishable from those in BASCOM, which allegedly improved an existing technological process by describing “how [a] particular arrangement of elements is a technical improvement over prior art ways of filtering [Internet] content,” i.e., “a filter implementation versatile enough that it could be adapted to many different users’ preferences while also installed remotely in a single location,” 827 F.3d at 1350. There is not, in the '050 patent, any “specific or limiting recitation of ... improved computer technology,” CLS Bank Int’l v. Alice Corp. Pty. Ltd., 717 F.3d 1269, 1286 (Fed. Cir. 2013) (en banc) (Lourie, J., concurring), as the asserted claims describe only generic computer elements.
Finally, IV argues that the '050 patent “shrink[s] the protection gap and moot[s] the volumé problem.” IV’s Opening Br. at 14. According to IV, the protection gap is “the period of time between identification of a computer virus' by an anti-malware provider and distribution of that knowledge to its users.” Id. at 10. The volume problem is the “exponential growth in malware and spam,” increasing the amount of antivirus signatures to be downloaded. Id. at 12-13. However, the asserted claims do not contain any limitations that address the protection gap or volume problem, e.g., by requiring automatic updates to the antivirus or antispam software or the ability to deal with a large volume of such software. We have explained that, “for a perceived abstract idea, if the claim ‘contains an “inventive concept” sufficient to “transform” the claimed abstract idea into a patent-eligible application,’ then the claims pass the test of eligibility under section 101.” Internet Patents Corp., 790 F,3d at 1347 (emphasis added) (quoting Alice, 134 S.Ct. at 2357). But when a claim directed to an abstract idea “contains no restriction on how the result is accomplished ... [and] [t]he mechanism ... is not described, although this is stated to be the essential innovation[,]” id. at 1348, then the claim is not patent-eligible.
The asserted claims of the '050 patent are not patent>eligible under § 101.
2. The T42 Patent
The district court held ineligible claims 1, 7, 17, 22, 24, and 26 of the '142 patent, which relate to systems and methods for receiving, screening, and distributing email, and we agree. According to IV, claim 1 is representative of how the '142 patent screens e-mail,[9] and recites:
1. A post office for receiving and redistributing email messages on a computer network, the post office comprising:
a receipt mechanism that receives an email message from a sender, the e-mail *1317 message having at least one specified recipient;
a database of business rules, each business rule specifying an action for controlling the delivery of an e-mail message as a function of an attribute of the e-mail message;
a rule engine coupled to receive an email message from the receipt mechanism and coupled to the database to selectively apply the business rules to the e-mail message to determine from selected ones of the business rules a set of actions to be applied to the e-mail message; and
a distribution mechanism coupled to receive the set of actions from the rule engine and apply at least one action thereof to the e-mail message to control delivery of the e-mail message and which in response to the rule engine applying an action of deferring delivery of the' e-mail message, the distribution engine automatically combines the email message with a new distribution list specifying at least one destination post office for receiving the e-mail message for review by an administrator associated with the destination post office, and a rule history specifying the business rules that were determined to be applicable to the e-mail message by at least one rule engine, and automatically delivers the e-mail message to a first destination post office on the distribution list instead of a specified recipient of the email message.
'142 patent, col. 27,11. 2-32.
The written description is particularly useful in determining what is well-known or conventional. See, e.g., Internet Patents Corp., 790 F.3d at 1348. The 142 patent’s abstract describes the invention -as “[a] system, method and various software products ... for automatic deferral and review of e-mail messages and other data objects in a networked computer system, by applying business rules to the messages as they are processed by post offices.” '142 patent, Abstract. Claim 1 also describes the patented system as a “post office”—albeit an electronic one. '142 patent, col. 27,11. 2. The district court held that “the asserted claims of the '142 patent are directed to human-practicable concepts, which could be implemented in, for example, a bfick-and-mortar post office.” J.A. 35.
We agree, and think the district court’s analogy to a corporate mailroom is also useful. Such mailrooms receive correspondence, keep business rules defining actions to be taken regarding correspondence based on attributes of the correspondence, apply those business rules to correspondence, and take certain actions based on the application of business rules. Those actions include gating the message for further review,[10] as in claim 1, and also releasing, deleting, returning, or forwarding the message, as described elsewhere in the '142 patent, see, e.g., col. 3,11. 30-39.
Indeed, in recounting the background of the invention, the patent states,
[m]any corporate organizations have elaborate methods to control the flow of memorandum, publications, notices, and other printed information within the organization. An organization may limit the types of documents employees can distribute at work, and in some cases, control which persons within an organization communicate with each other— These various rules are typically doeu- *1318 mented as part of- the organization’s business communication policies.
Id. at col. 1,11. 15-33. Thus, the '142 patent itself demonstrates that the claimed systems and methods of screening messages are abstract ideas, “fundamental ... practice[s] long prevalent in our system” and “method[s] of organizing human activity.” Alice, 134 S.Ct. at 2356 (citations and internal quotation marks omitted); see also Intellectual Ventures v. Capital One Bank, 792 F.3d at 1369.
And IV itself informed the district court, in its technology tutorial, “[i]n the typical environment, the post office resides on a mail server, where the company’s emails are received, processed, and routed to recipients.' Conceptually, this post office is not much different than a United States Postal Service office that processes letters and packages, except that the process is all computer-implemented and done electronically in a matter of seconds.” J.A. 40.
This demonstrates that the concept is well-known and abstract. Furthermore, with the exception of generic compúter-implemented steps, there is nothing in the claims themselves that foreclose them from being performed by a human, mentally or with pen and paper. See CyberSource, 654 F.3d at 1371-72. Indeed, the specification expressly states that one type of post office, the gatekeeping post office, which “provides for administrative review and processing óf gated messages ..: provides for both manual review by a gatekeeper— a person- designated to review gated messages—and automatic review and processing.” 142 patent, col. 7, 11. 31-35; see also id. at col. 11, 11. 7-10. The '142 patent is directed to- a1 conventional business practice—the screening of messages by corporate organizations—in the context of electronic communications.
Since the claims are directed to an abstract idea, we proceed to Mayo/Alice step two. According to the specification, the claims can “operate[ ] on a conventional communications network.” Id. at col. 5,1. 46. The post offices are “[c]ommunicatively coupled to the network through conventional e-mail protocols,” and “conventional mail servers and conventional post office/mail server combinations may be present.” Id. at col. 5, 11. 48-49, 55-57. The patent discloses only generic computers performing generic functions: “[t]he [Rule Enforcing Post Offices] and [Gatekeeping Post Offices] are preferably implemented as software products executing on conventional server-class computers, such as ... IBM compatible computers based on Intel Inc.’s Pentium™ processors. The servers operate in conjunction with conventional operating systems, such, as UNIX™, or Microsoft Corp.’s Windows95™ or Win-dowNT™.” Id. at col. 9, 11. 51-58. The specification thus confirms.that the implementation of the abstract idea is routine and conventional. The '142 patent does not “improve the functioning of the computer itself.” Alice, 134 S.Ct. at 2359 (citation omitted). Nor does it solve a “challenge particular to the Internet.” DDR Holdings, 773 F.3d at 1257.
IV argues that the claims do not merely require routine and conventional use of computers and the Internet because “applying business rules to email is not what computers and the Internet do in the absence of this claim limitation” and “because computers and the Internet do not have ‘rule engines’ as a matter of course.” IVs Opening Br. at 54. But the inquiry is not whether conventional computers already apply, for example, well-known business concepts like hedging or intermediat-ed settlement. Rather, we determine whether “each step does no more than require a generic computer to perform generic computer functions.” Alice, 134 S.Ct. *1319 at 2359 (emphasis added). Here that is the case.
The asserted claims of the '142 patent are not patent-eligible under § 101.
3. The '610 Patent
Claim 7 is the only asserted claim of the '610 patent. The district court held eligible claim 7 of the '610 patent. Claim 7 depends from claim 1, which provides:
1. A virus screening method comprising the steps of:
routing a call between a calling party and a called party of a telephone network;
receiving, within the telephone network, computer data from a first party selected from the group consisting of the calling party and the called party;
detecting, within the telephone network, a virus in the computer data; and
in response to detecting the virus, inhibiting communication of at least a portion of the computer data from the telephone network to a second party selected from the group consisting of the calling party and the called party.
'610 patent, col. 14, 11. 34-47. Claim 7 recites:
7. The virus screening method of claim 1 further comprising, the step of determining that virus screening is to be applied to the call based upon at least one of an identification code of the calling party and an identification code of the called party.
Id. at col. 14,1. 66-eol. 151. 3.
Unlike the asserted claims of the '050 and- '142 patents, claim 7 involves an idea that originated in the computer era— computer virus screening. But the idea of virus screening was nonetheless well known when the '610 patent was filed. Performing virus screening was a long prevalent practice in the field of computers, and, as the patent admits, performed by many computer users. The patent acknowledges that, prior to the invention, “[m]any computer users [had] virus screening and detection software installed on their computers.” Id. at col. 1, 11. 10-11. Claim 7 of the '610 patent, however, does not claim a new method of virus screening or improvements thereto—in fact, it requires only “detecting ... a virus in the computer data.” Id. at col. 14, 11. 40-41. The specification recites conventional “virus screening software.” See, e.g., -610 patent, col. 3, 11. 35-39. By itself, virus screening is well-known and constitutes an abstract idea.
At step two of Mayo/Alice, there is no other aspect of the claim that is anything but conventional.
The '610 patent is directed to the use of well-known virus screening software within the telephone network[11] or the Internet. We have previously determined that performing otherwise abstract activity on the Internet does not save the idea from being patent-ineligible. As we said in Intellectual Ventures v. Capitol One Bank, “[a]n abstract idea does not become nonabstract by limiting the invention to a particular ... technological environment, such as the Internet.... [W]hile the claims recite budgeting using a ‘communication medium’ (broadly including the Internet and telephone networks), that limitation does not render the claims any less abstract.” 792 F.3d at 1366-67. See also Ultramercial, 772 F.3d at 716 (Fed. Cir. 2014) (“The ■ claims’ invocation of the Internet also adds no inventive concept. As we have held, the use of the Internet is not *1320 sufficient to save otherwise abstract claims from ineligibility under § 101.”).[12]
. Just as performance of an abstract idea on the Internet is abstract, so too the performance of an abstract concept in the environment of,the telephone network is abstract, as Intellectual Ventures v. Capitol One Bank recognized. Our regent decision in TLI Communications involved a similar situation. There, we held that a challenged claim was “drawn to the concept of classifying an image and storing the image based on its classification.” 823 F.3d at 611. This was abstract' because “[wjhile the [asserted claim] requires concrete, tangible components such as -‘a telephone unit’ and a ‘server,’ the specification makes clear that the recited physical components merely provide a generic environment in which to carry out the abstract idea of classifying and storing digital images in an organized manner.” Id. Here, the recitation of a “telephone network,” like the telephone unit and server in TLI Communications, merely provides a “generic environment” in which to carry out the well-known and abstract idea of virus screening.
Nor does the asserted claim improve or change the way a computer functions. Claim 7 recites no more than generic computers that use generic virus screening technology. But the “mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention.” Alice,■ 134 S.Ct. at 2358. “For the role of a computer in- a computer-implemented invention to be deemed meaningful in the context of this analysis, it must involve more than performance of Veil-understood, routine, [and] conventional activities previously known to the industry.’” Content Extraction, 776 F.3d at 1347-48 (quoting Alice, 134 S.Ct. at 2359).
As the district court determined, claim 7 calls for at least three computers: the computer of the first party or sending party, the virus screening computer, and the computer of the second or receiving party. The sending and receiving computers can be generic—they perform only sending and receiving functions. See bu-ySAFE, 765 F.3d at 1352, 1355. The virus screening computer fares no better. According to the specification, “[v]irus screening can be facilitated in the telephone network using either a conventional telephone network processor adapted to run associated virus screening software or an additional processor which runs virus screening software.... The processor can augment conventional circuit-switched network elements..., ” '610 patent, col. 3, 11. 35-39, 49-50 (emphasis added). “As is well known, each of the virus-screening processors can have one or more associated modems to modulate computer data for transmission, and to demodulate received computer data.” Id. at col. 4, 11. 58-61. There is no indication that the virus screening software installed on a conventional telephone network processor is any different than the virus screening software “[m]any computer users have ... installed on their computers.” Id. at col. 1,11.10-11. These “generic computer components [are] insufficient to add an inventive concept to an otherwise abstract idea.” TLI Commc’ns, 823 F.3d at 614.
IV argues that “[t]he claims of the '610 Patent include meaningful limitations that narrow the claimed invention to a specific way of screening for computer viruses within the telephone network ... and does not -preempt all virus detection.” *1321 TV’s Response and Reply Br. at 55. A narrow claim directed to an abstract idea, however, is not necessarily patent-eligible, for “[w]hile preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility.” Ariosa Diagnostics, Inc. v. Sequenom, Inc., 788 F.3d 1371, 1379 (Fed. Cir. 2015); see also OIP Techs., 788 F.3d at 1362-63 (“[T]hat the claims do not preempt all price optimization or may be limited to price optimization in the e-commerce setting do not make them any less abstract.”).
In summary, unlike the claims at issue in Enfish, which involved a “specific type of data structure designed to improve the way a computer stores and retrieves data in memory,” 822 F.3d at 1339, claim 7 of the '610 patent does not improve or change the way a computer functions. Nor does claim 7 overcome a problem unique to the Internet as was the case in DDR Holdings. 773 F.3d at 1258-59.
Citing BASCOM, the dissent argues that “claim 7 constitutes an improvement of the network itself and, thus, focuses on improving computers as tools.” Dissenting Op. at 1331. Contrary to the dissent, this case is unlike BASCOM, where, “[o]n [a] limited record” and when viewed in favor of the patentee, the claims alleged a “technical improvement over prior art ways of filtering [Internet] content.” 827 F.3d at 1350. The patent in BASCOM did not merely move existing . content filtering technology from local computers to the Internet,[13] which “would not contain an inventive concept,” but “overc[a]me[ ] existing problems with other Internet filtering systems”—i.e., it solved the problem of “inflexible one-size-fits-all” remote filtering schemes (caused by simply moving filtering technology to the Internet) by enabling individualized filtering at the ISP server. Id. at 1350-51. In other words, the patent in BASCOM did not purport to improve the Internet itself by introducing prior art filtering technology to the Internet. Rather, the BASCOM patent fixed a problem presented by combining the two. Here the record does not indicate that claim 7 recites any improvement to conventional virus screening software, nor does claim 7 solve any problem associated with situating such virus screening on the telephone network.
The dissent nonetheless urges that there are two advantages to using virus screening on the telephone network that qualify as inventive concepts: (1) shifting virus detection away from the networks of the sender and recipient, which allows users to communicate over a network without concern of receiving computer viruses; and (2) closing the “protection gap,” i.e., the problem of individual computer users having to periodically update their virus screening software. Dissenting Op. at 1329.
Regarding shifting virus detection to the telephone network, the claimed inventive solution of claim 7 is to utilize an intermediary computer in forwarding information. But that solution is perfectly conventional and is applied any time an e-mail recipient performs virus screening and, acting as an intermediary, forwards the email to another recipient. As discussed above, there is no claim here describing a particular method of incorporating virus screening into the Internet.[14] To be sure, it may be that *1322 other claims that recite particular features of intermediate computers (e.g., modeling to match the recipient’s computer architecture) incorporate an inventive concept, but those claims are not before us.
As to the protection gap, claim 7 of the '610 patent does not describe or require a solution to the protection gap. See supra at 13-14 (explaining that the language of the challenged claims of the '050 patent do not address the protection gap). The district court erred in relying on technological details set forth in the patent’s specification and not set forth in the claims to find an inventive concept. See Accenture, 728 F.3d at 1345 (“[T]he complexity of the implementing software or the level of detail in the specification does not transform a claim reciting only an abstract concept into a patent-eligible system or method.”); Content Extraction, 776 F.3d at 1346 (“We focus here on whether the claims of the asserted patents fall within the excluded category of abstract ideas.”) (emphasis added).
As we explained in TLI Communications, the claim here is “not directed to a specific improvement to computer functionality. Rather, [it is] directed to the use of conventional or generic technology in a nascent but well-known environment, without any claim that the invention reflects an inventive solution to any problem presented by combining the two.” 823 F.3d at 612
Claim 7 of the '610 patent is not patent-eligible under § 101.
AFFIRMED-IN-PART AND REVERSED-IN-PART
Costs
Costs to defendants.

. We refer to Trend Micro Incorporated and Trend Micro, Inc. (USA) together as a singular defendant "Trend Micro.”

. The jury awarded $9 million for infringement of the '142 patent and $8 million for infringement of the '610 patent.

.While Trend Motion did not" state under which rule it brought its motion, the district ■ court applied the Fed. R. Civ. P. 56 summary judgment standard, and the parties did not dispute the application of that standard.

. The entry of final judgment ripened Syman-tec's cross-appeal. See Pause Tech. LLC v. TiVo Inc., 401 F.3d 1290, 1295 (Fed. Cir. 2005),

. See., e.g., Bilski, 561 U.S. at 611, 130 S.Ct 3218 (claims directed to risk hedging); Alice, 134 S.Ct. at 2356 (claims directed to idea of intermediated settlement); In re TLI Commc’ns LLC Patent Litig., 823 F.3d 607, 611 (Fed. Cir. 2016) (claims directed to classifying a digital image and storing the image based on its classification); Mortg. Grader, Inc. v. First Choice Loan Servs. Inc., 811 F.3d 1314, 1324 (Fed. Cir. 2016) (claims drawn to well-known idea of anonymous loan shopping); Versata Dev. Grp., Inc. v. SAP Am., Inc., 793 F.3d 1306, 1333 (Fed. Cir. 2015) (claims directed to idea of determining a price using organizational and product group hierarchies); Internet Patents Corp. v. Active Network, Inc., 790 F.3d 1343, 1348 (Fed. Cir. 2015) (claims directed to idea of retaining information in the navigation of online forms); OIP Techs., 788 F.3d at 1362-63 (claims directed to offer-based price optimization); Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass’n, 776 F.3d 1343, 1347 (Fed. Cir. 2014) (claims directed to the idea of collecting data, recognizing certain data within the collected data set, and storing that recognized data in a memory); Ultramercial, Inc. v. Hulu LLC, 772 F.3d 709, 714-15 (Fed. Cir. 2014) (claims directed to displaying an advertisement in exchange for access to copyrighted media); buySAFE, Inc. v. Google, Inc., 765 F.3d 1350, 1355 (Fed. Cir. 2014) (claim directed toward guaranteeing a party's performance in a transaction); Accenture Global Servs., GmbH v. Guidewire Software, Inc., 728 F.3d 1336, 1342 (Fed. Cir. 2013) (claims directed to automated methods for generating task lists); Dealertrack, Inc. v. Huber, 674 F.3d 1315, 1333 (Fed. Cir. 2012) (claims directed to processing information through a clearinghouse); CyberSource Corp. v. Retail Decisions, Inc., 654 F.3d 1366, 1373 (Fed. Cir. 2011) (claims directed to a method for verifying the validity of a credit card transaction). See also McRO, Inc. v. Bandai Namco Games Am. Inc., No. 2015-1080, 2016 WL 4896481, at *8-10 (claims "focused on a specific asserted improvement in computer animation, i.e., the automatic use of rules of a particular type” held not to be directed to ineligible subject matter).

. For example, it is common for "an occupant who receives genetically addressed mail [to] discard it as junk mail.” Jones v. Flowers, 547 U.S. 220, 248, 126 S.Ct. 1708, 164 L.Ed.2d 415 (2006) (Thomas, J., dissenting).

. In BASCOM, we found the claims patent-eligible because, at step two, the patent claimed "a technology-based solution (not an abstract-idea-based solution implemented with generic technical components in a conventional way) to filter content on the Internet that overcomes existing problems with other Internet filtering systems.” 827 F.3d at 1351.

. See also Parker v. Flook, 437 U.S. 584, 588, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978) ("This case turns entirely on the proper construction of § 101.... It does not involve the familiar issues of novelty and obviousness that routinely arise under §§ 102 and 103 when the validity of a patent is challenged. For the purpose of our analysis, we assume that respondent’s formula is novel and useful and that he discovered it.”).

. Defendants agree, and IV does not dispute, that "[a]ll of the claims are substantially similar and no party claims that they differ in any manner relevant” to the § 101 analysis. Opening Br. of Cross-Appellant Symantec Corp. at 10. We focus on claim 1 of the '142 patent, which IV states is representative. Addressing each of the asserted claims is unnecessary when "all the claims are substantially similar and linked to the same abstract idea." Content Extraction, 776 F.3d at 1348 (internal quotation marks and citation omitted).

. The specification states, “[f]or example, a business rule to gate an e-mail for further review may be triggered for any e-mail message that is addressed to the president of the company.” '142 patent, col, 3, 45-48.

. The district court construed "within the telephone network” to mean "in the voice or data network connecting the calling party and called party, exclusive of the networks and gateway nodes of the called party and calling party.” J.A, 276.

. See also, e.g., buySAFE, 765 F.3d at 1355 ("The computers in Alice were receiving and sending information over networks connecting the intermediary to the other institutions involved, and the Court found the claimed role of the computers insufficient.”).

. Indeed, in BASCOM, the patent specification acknowledged that several prior art systems already performed content filtering at either local or remote servers. See 827 F,3d at 1344.

. See Affinity Labs of Tex., LLC v. DirecTV, LLC, No. 2015-1845 (Fed. Cir. Sept. 23, 2016), 838 F.3d. 1262-63, 2016 WL 5335501, at *6-8 (holding patent ineligible where it “d[id] not provide an inventive solution to a . problem in implementing the idea of remote *1322 delivery of regional broadcasting; it simply recite[d] that the abstract idea of remote delivery will be implemented using the conventional components and functions generic to cellular telephones.”).