LINN, Circuit Judge, dissenting in part and concurring in part. The court once again concludes that the judicially crafted “abstract idea” exception to patent eligibility now renders invalid the asserted claims of four U.S. patents covering apparatus and methods created by human activity to overcome heretofore perceived limitations in the- use of ordinary bankcards to access transit systems. The majority commits the same error as the district court in engaging in a reductionist exercise of ignoring the limitations of the claims in question and, at least with respect to the ’003 and ’617 patents, in failing to appreciate that the abstract idea exception—if it is to be applied at all—must be applied narrowly, consistent with its genesis. Because the representative claims of the ’003 and ’617 patents are not directed to abstract ideas under any reasonable application of the Alice!Mayo test, I respectfully dissent. Because the majority’s determination with respect to the representative claims of the ’816 and ’390 patents is consistent with past decisions finding ineligibility, I concur with that part of its decision, not because the inventions covered by the claims do not deserve patent protection but because I am bound by precedent to reach that conclusion. I. Patent Eligibility The language of Section 101 is well-recognized as providing a wide and permissive scope for patent eligibility. Bilski v. Kappos, 661 U.S. 593, 601, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010) (quoting Diamond v. Chakrabarty, 447 U.S. 303, 308, 100 S.Ct. 2204, 66 L.Ed.2d 144 (1980)) (“In choosing such expansive terms ... modified by the comprehensive ‘any,’ Congress plainly contemplated that the patent laws would be given wide scope.”). Within this expansive provision, the Supreme Court has recognized “an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable.” Alice Corp. v. CLS Bank Int’l, — U.S. —, 134 S.Ct. 2347, 2354, 189 L.Ed.2d 296 (2014) (quoting Mayo Collaborative Servs. v. Prometheus Labs., Inc., 566 U.S. 66, 132 S.Ct. 1289, 1293, 182 L.Ed.2d 321 (2012)); Assoc. for Molecular Pathology v. Myriad Genetics, Inc., 569 U.S. 576, 133 S.Ct. 2107, 2116, 186 L.Ed.2d 124 (2013); Bilski, 561 U.S. at 601-02, 130 S.Ct. 3218; Diamond v. Diehr, 450 U.S. 175, 185, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981); Parker v. Flook, 437 U.S. 584, 589, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978); Gottschalk v. Benson, 409 U.S. 63, 67, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972); Le Roy v. Tatham, 55 U.S.(14 How.) 156, 174-75, 14 L.Ed. 367 (1853). These three “exceptions” share a common origin and address what the Supreme Court saw and has often reiterated as a related set of common concerns. “A principle, in the abstract, is a fundamental truth; an original cause; a motive; these cannot be patented, as no one can claim in either of them an exclusive right.” Le Roy, 55 U.S. at 175; see also, Diehr, 450 U.S. at 185, 101 S.Ct. 1048; Diamond v. Chakrabarty, 447 U.S. at 309, 100 S.Ct. 2204; Bilski, 561 U.S. at 601-02, 130 S.Ct. 3218; Mayo, 132 S.Ct. at 1293; Alice, 134 S.Ct. at 2354. “[A]n idea of itself is not patentable.” Rubber-Tip Pencil Co. v. Howard, 87 U.S.(20 Wall.) 498, 507, 22 L.Ed. 410 (1874). “[A] scientific truth, or the mathematical expression of it, is not [a] patentable invention.” Mackay Co. v. Radio Corp., 306 U.S. 86, 94, 59 S.Ct. 427, 83 L.Ed. 506 (1939). “He who discovers a hitherto unknown phenomenon of nature has no claim to a monopoly of it which the law recognizes.” Funk Bros. Seed Co. v. Kalo Inoculara, Co., 333 U.S. 127, 130, 68 S.Ct. 440, 92 L.Ed. 588 (1948). These cases make clear that a fundamental truth, an original cause, a motive, an idea of itself, a scientific truth, or the mathematical expression of it, or a phenomenon of nature, are not patent eligible. The underlying concerns common to these eligibility exceptions is that the patenting of these sorts of basic tools of scientific and technological activity risks foreclosing innovation and inhibiting human ingenuity. “Phenomena of nature, though just discovered, mental processes, and abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work.” Benson, 409 U.S. at 67, 93 S.Ct. 253; Alice, 134 S.Ct. at 2354 (same). The Supreme Court has “repeatedly emphasized this ... concern that patent law not inhibit further discovery by improperly tying up the future use of these building blocks of human ingenuity.” Alice, 134 S.Ct. at' 2354 (quoting Mayo, 132 S.Ct. at 1301). The “monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it.” Mayo, 132 S.Ct. at 1293. The Supreme Court tags this underlying concern “pre-emption.” Alice, 134 S.Ct. at 2354. It can be appreciated from this history that there is no principled difference between the judicially recognized exception relating to “abstract ideas” and those relating to laws of nature and natural phenomena. All three nonstatútory exceptions are intended to foreclose only those claims that preempt and thereby preclude or inhibit human ingenuity with regard to basic building blocks of scientific or technological activity. They are intended to be read narrowly. Alice, 134 S.Ct. at 2354 (quoting Mayo, 132' S.Ct. at 1293) (“[W]e tread carefully in construing -this exclusionary principle lest it swallow all of patent law. At some level, ‘all inventions ... embody, use, reflect, Test, upon, or apply daws of nature, natural phenomena, or abstract ideas.’ ”). The narrow character of the law of nature and natural phenomenon exceptions is relatively self-evident, but the contours of the abstract idea .exception are not easily defined. For that reason, the abstract idea exception is almost impossible to apply consistently and coherently. To determine whether a claim is patent ineligible as merely an abstract idea, the Supreme Court instructed that the inquiry may be broken into two parts or steps: first, determine if the claim is “directed to an abstract idea,” and second, consider whether the claim contains something more in terms of an “inventive concept.” Alice, 134 S.Ct. at 2355; Mayo, 132 S.Ct. at 1296-97. The problem with this test, however, is that it is indeterminate and often leads to arbitrary results. Moreover, if applied in a legal vacuum divorced from its genesis and treated differently from the other two exceptions, it can strike down claims covering meritorious inventions not because they attempt to appropriate a basic building block of scientific or technological work, but simply because they seemingly fail the Supreme Court’s test. In applying the Supreme Court’s test, we are instructed to examine the claims’ “character as a whole,” Internet Patents Corp. v. Active Network, Inc., 790 F.3d 1343, 1346 (Fed. Cir. 2015), and look to “capture[ ] the ‘basic thrust’ of the Asserted Claims,”. Synopsys, Inc. v. Mentor Graphics Corp., 839 F.3d 1138, 1150 (Fed. Cir. 2016) (quoting BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC, 827 F.3d 1341, 1348 (Fed. Cir. 2016)), or the “prominent idea in the mind of the inventor,” Rubber-Tip Pencil, 87 U.S. at 506. This often results in the re-characterization of claims to “a high level of abstraction.” Enfish, LLC v. Microsoft Corp., 822 F.3d 1327, 1337 (Fed. Cir. 2016). Re-characterizing claims in a way that is “untethered from the language of the claims all but ensures that -the exceptions to § 101 swallow the rule.” Id. But if we are not to re-characterize the claims, what are we supposed to do? Are we not to ignore any limitations? May we ignore some?' If so, which ones? Which limitations matter and which do not? What exactly is the task at hand under step one? Step one cannot be a hunt for the abstract idea underlying the claim, because underlying virtually every claim is an abstract idea.. And if the task under step one is to assess whether .the claim is directed to no more than an abstract idea, what is left for determination under step two? Where do you draw the line between properly determining what the claim is directed to and improperly engaging in an overly reductionist exercise to find the abstract idea that underlies virtually every claim? See Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc., 827 F.3d 1042, 1050 (Fed. Cir. 2016) (“At step one, therefore, it is not enough to merely identify a patent-ineligible concept underlying the claim; we must determine whether that patent-ineligible concept is what the claim is ‘directed to.’”). Despite the number-of cases that have faced these questions and -attempted to provide practical guidance, great uncertainty yet remains. And the danger- of getting the answers to these, questions wrong is greatest for some of today’s most important inventions in computing, medical diagnostics, artificial intelligence, the Internet of Things, and robotics, among other things. A few things should be apparent. First, it is always important to look at the actual language of the claims. By statute, such language “particularly point[s] out and distinctly claim[s] the. subject matter which the inventor [ ] regards as the invention.” 35 U.S.C. § 112; See Alice, 134 S.Ct. at 2355 (“[Fjirst determine whether the claims at issue are directed to a patent-ineligible concept.” (emphasis added)); 35 U.S.C. § 100(j) (“The term ‘claimed invention’ means the subject matter defined by a claim in a .patent or an application for a patent.”). I do not mean to. imply that a formal claim construction is required in every Section 101 case. What a claim is directed to is often apparent without an in-depth analysis. See, e.g., Ultramercial, Inc. v. Hulu, LLC, 772 F.3d 709, 719 (Fed. Cir. 2014) (“No formal claim construction was required because the asserted claims disclosed no more than an abstract idea garnished with accessories and there was no reasonable construction that would bring [them] within patentable subject matter” (internal quotations omitted, alteration in original)). But individual claim limitations cannot be ignored. By virtue of their inclusion in the claims, every- limitation warrants some consideration as to the role it plays in reciting the invention. Second, in considering the roles played by individual limitations, it is important to read the claims “in light of the specification.” Enfish, 822 F.3d at 1335; In re TLI Commc’ns LLC Patent Litig. 823 F.3d 607, 611-13 (Fed. Cir. 2016); AmDocs (Israel) Ltd. v. Openet Telecom, Inc., 841 F.3d 1288, 1299 (Fed. Cir. 2016). The specification is, “[i]n most cases, the best source for discerning the proper context of claim terms.” Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1360 (Fed. Cir. 2004), cert. granted, 546 U.S. 975, 126 S.Ct. 543, 163 L.Ed.2d 458 (2005), cert. dismissed, 548 U.S. 124, 126 S.Ct. 2921, 165 L.Ed.2d 399 (2006) (per curiam). A determination of what the claims are directed to is often aided by a consideration of the specification and its description of the problem to be solved and the discovered solution to that problem. The specification is a useful aid in the court’s determination of the thrust of the invention or what the inventors “characterize [as] their contribution to the art.” In re Diehr, 602 F.2d 982, 983 (C.C.P.A. 1979) (Rich, J.), aff'd, 450 U.S. 175, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981). Ultimately, the fundamental question in “abstract idea” eases is whether the claim is directed to such a basic building block of scientific or technological activity as to foreclose or inhibit future innovation or whether the claim instead is directed to a tangible application that serves a “new and useful end.” Benson, 409 U.S. at 67, 93 S.Ct. 253; see also Diehr, 450 U.S. at 188, 101 S.Ct. 1048 (“While a scientific truth, or the mathematical expression of it, is not a patentable invention, a novel and useful structure created with the aid of knowledge of scientific truth, may be.” (quoting Mackay Radio, 306 U.S. at 94, 306 U.S. at 94, 59 S.Ct. 427)). Claims directed not merely to basic building blocks of scientific or technological activity but instead to innovative solutions to real problems that result from human activity and are not capable of performance solely in the human mind should be fully eligible for patent protection and not lightly discarded. II. The Technology and Background In conventional transit systems, access is rapidly provided through a turnstile by directly depositing the required fare using cash, tokens or some form of proprietary fare card. Such systems generally do not use conventional bankcards. Conventional bankcard transactions use a card reader in contact with the card’s magnetic strip or imbedded chip to read the card number and other data at a merchant’s location. The read data is then transmitted over a telephone line or network to a merchant bank for verification of card validity and fund availability. The merchant bank processes the received data and returns to the merchant an approval or disapproval message, ’003 patent, col.l, 11.23-36. This takes a certain amount of time and requires some form - of connectivity between the merchant and the merchant bank. According to Smart Systems, the latency in such conventional bankcard transactions and the lack of network connectivity in some transit control points render conventional bankcards impractical for point-of-access use in a transit system that requires rapid fare processing. The four patents in suit relate to methods and systems that overcome these latency and connectivity problems and enable the use of conventional bankcards to gain access to a transit system. Id. at coll, 1.52-col.3,1.14. The district court treated all of the patents as if they were essentially the same despite the differences that are apparent from the language of the claims. The district court deliberately ignored those limitations and concluded that, “[s]tripped of the technical jargon that broadly describes non-inventive [limitations] (e.g. the ‘interfaces’ and ‘processing systems’), and further shorn of the typically obtuse syntax of patents, the patents here really only cover an abstract concept: paying for a subway or bus ride with a credit card.” Smart Sys. Innovations, LLC v. Chicago Trans. Authority, No. 14-C-08053, 2015 WL 4184486, at *4 (N.D. Ill. July 10, 2015) (“District Court Opinion”). See Alice, 134 S.Ct. 2347; Mayo, 132 S.Ct. 1289. The district court erred in ignoring what the claims actually recited. The majority here commits the same error. III. The Patents on Appeal The four patents asserted by Smart Systems in this appeal can be divided into two groups. The first group includes the ’003 patent and the ’617 patent, which, as Smart Systems categorizes them, “claim systems and methods for using a bank card directly at a physical gate or terminal to enter a mass transit system.” Appellant’s Opening Br. at 19. These patents disclose the use of a bankcard reader to scan a credit or bankcard and a processor to compare the scanned data against a locally-stored “white list” of approved transit accounts. If the card owner is listed as an account-holder, access is granted without immediately having to establish network connectivity to process and charge the account, which can be done at a later time. If the card owner is not listed as an account-holder, access is denied. The second group includes the ’390 patent and the ’816 patent. These patents claim features relating to the use of conventional bankcards to implement time-based fare rules despite the inability of bankcards to accept and store data. A. The ’003 and ’617 Patents The majority makes the same error as the district court in treating all of the representative claims together and in concluding that they are directed to “the formation of financial transactions in a particular field (i.e., mass transit) and data collection related to such transactions,” Maj. Op. at 1372, or to “the collection, analysis, and classification of information,” id. at 17, and concluding that those are abstract ideas. The majority’s abstractness determination turns wholly on the level of generality with which it describes the focus[1] of the claims and is at such a high level of abstraction as to overlook and misstate what the inventors considered to be their invention. Categorizing the particular mechanism of action of the inventions claimed in the ’003 and ’617 patents as “the formation of financial transactions in a particular field” or “the collection, analysis, and classification of information,” does not correctly reflect that the ’003 and ’617 patents contain limitations that together enable the identification of a bankcard as authorized for use in accessing a transit system. This is much like the identification of a coin or token as genuine in a mechanical transit system toll device. The specific limitations can be appreciated from the language of representative claim 14 of the ’003 patent and claim 13 of the ’617 patent. The majority’s characterization of the claims ignores the limitations explicitly tying the recited method to a transit system and directed to the method of “validating entry into a first transit system,” “downloading ... a set of bankcard records comprising ... an identifier of a bankcard previously registered with the processing system,” “determining an identifier based on at least part of the bankcard data,” “determining whether the currently presented bankcard is contained in the set of bankcard records,” and “denying access [under certain conditions].” ’003 patent, col.15, 1.51-col.l6, 1.6. See also ’617 patent, col.ll, 1.62-col.l2, 1.18 (claim 13 reciting similar limitations). The focus of the claims, evident from these limitations, is the use of a white list in combination with a bankcard reader to regulate access to mass transit. This combination overcame the latency and connectivity issues that previously precluded the practical use of a bankcard to regulate mass transit. As explained in the specification, the bankcard in this invention “function[s] primarily as [an] identifying token[ ] until the total charge is computed on a back-end fare processor.” ’003 patent, eol.6,11.34-35. The result of the interaction between the bankcard, the white list, and the terminal is the off-line regulation of access. Id. at col. 9, 11.11-21. This is not a financial transaction. The processing and payment of transit fares occurs later in time, after access is granted, and is not the subject of any of the representative claims of the ’003 and ’617 patents. Nor is this merely the collection, analysis, and classification of information. The claims call for much more in making practical use of data from a conventional bankcard to gain access to a transit system. At bottom, both of the majority’s categorizations fail to reflect the combination of limitations that embody the inventors’ asserted advance over the prior art. The majority asserts that the dissent’s characterization “ignores what is actually recited in the Asserted Claims,” and that “the claims are directed to the collection, analysis, and classification of information, and not access alone.” Maj. Op. at 1373 (citing the “data” and “bankcard reader” claim elements). The majority seems to imply that a claim directed to “access alone” could be patent eligible, but one directed to controlling access by manipulating information would not be patent eligible. That the claims call for some “data” manipulation and a “bankcard reader” overlooks claim limitations making use of that data manipulation to control access to a transit system. See Diehr, 450 U.S. at 187, 101 S.Ct. 1048 (“[A] claim drawn to subject matter otherwise statutory does not become nonstatutory simply because it uses a mathematical formula, computer program, or digital computer.”). The data and data processing included in the claims as a whole are what support and enable the control of mass transit access in an allegedly novel way—Smart Systems does not seek to claim the data itself or the data manipulation itself. The recited transit system in these claims is not merely a generic environment or “field of use” to a particular environment, which may be ignored. Maj. Op. at 1373 (quoting Affinity Labs of Tex., LLC v. DIRECTV, LLC, 838 F.3d 1253, 1259 (Fed. Cir. 2016)); see Intellectual Ventures I LLC v. Symantec Corp., 838 F.3d 1307, 1320 (Fed. Cir. 2016) (explaining that the “directed to” inquiry should exclude components that defíne a “generic environment in which to carry out [an] abstract idea” (internal quotation marks omitted) (quoting TLI Comrmmications, 823 F.3d at 611)); Enfish, 822 F.3d at 1337-38 (rejecting district court’s characterization of the claims as having “oversimplified the self-referential components of the claims and' downplayed the invention’s benefits”). The particular challenge of facilitating use of conventional bankcards to access mass transit is at the heart of the invention, much like the challenge of curing rubber was at the heart of the invention in Diehr. Nor do the claims here merely describe a function without claiming or describing the means by which that function is accomplished. See McRO, Inc. v. Bandai Namco Games Am. Inc., 837 F.3d 1299, 1312 (Fed. Cir. 2016). The claims recite more than a function and instead cover a specifically stated means to accomplish the function of transit system access by comparing bankcard data to a locally stored white list of approved bankcards., The claims do not preclude other means of access or other forms of authorization or identification. This also is not a case involving improvements in component functionality. The role of the claimed components here is unlike that in Alice and in Content Extraction. In Alice, the Court explained that the hardware components in the claims at issue— “data processing system,” “communications controller,” and “data storage unit”— were “purely functional and generic” because “[n]early every computer will include” those components. Alice, 134 S.Ct. at 2360 (quoting CLS Bank Int’l v. Alice Corp., 717 F.3d 1269, 1291 (Fed. Cir. 2013) (en banc) (Lourie, J., concurring)). Similarly, in Content Extraction, the “scanner” that was alleged to be the eligibility-defining component, wás merely the generic hardware implementing the claimed collection of hardcopy data. 776 F.3d at 1348. Unlike those cases, the claimed combination of a white list with a bankcard reader to regulate access to a transit system is not dependent on component functionality and is not merely a generic computer implementation of an idea or the linkage of an idea to a particular technological environment. To the contrary, the claimed combination here is a different way of accessing a transit system by using a conventional bankcard without the need for immediate network connectivity and without the latency previously considered an inherent limitation on the use of ordinary bankcards for such purposes. Even if the bankcard reader itself is considered similar to the scanner in Content Extraction, nothing in Content Extraction parallels the combination of a bankcard reader, a white list, and transit system access control called for in the claims of the ’003 and ’617 patents.[2] The claims of the ’003 patent and ’617 patent are not directed to one of the categories of invention that the Supreme Court and this court have deemed particularly suspect. The bankcard white list access control method here is not a “fundamental economic practice long prevalent in our system of commerce,” see Alice, 134 S.Ct. at 2356, a “method of organizing human activity” or human behavior, see id.; BAS-COM, 827 F.3d at 1348, a method of calculating a number, see Flook, 437 U.S. at 595 n.18, 98 S.Ct. 2522, ór a mathematical formula or algorithm, see Benson, 409 U.S. at 71-72, 93 S.Ct. 253. Finally, the claims of the ’003 patent and the ’617 patent do not merely reflect a combination of financial and data transactions. See Maj. Op. at 16-17. The allowance or refusal of access is no more abstract when performed using a computer and a card reader than when performed using a physical token to regulate access to a transit system by mechanically comparing a token to a slug. In both cases, the inventions are directed to tangible applications that serve a new and useful end. Subject to meeting the other statutory conditions of patentability, they are equally deserving of patent protection. Regulating access to mass transit by comparing bankcard identifying data with a white list is a tangible technological solution to the real-world problems of latency and connectivity. The claims of the ’003 and ’617 patents do not cover the kind of basic building block of scientific or technological activity that would foreclose or inhibit future innovation. Instead, they recite limitations that cannot properly be ignored in enabling conventional bankcards to be used in regulating access to a transit system. Under any reasonable application of the Alice/Mayo abstract idea test, consistent with its genesis as a narrow judicial exception to the broad statutory categories of patent eligible subject matter and cognizant of the limitations recited in the claims, I am compelled to conclude that the asserted claims of the '003 and ’617 patents are not directed to an abstract idea and should not be held patent ineligible under 35 U.S.C. § 101. I therefore respectfully dissent from the majority’s holding to the contrary. B. ’816 and ’390 Patents While the representative claims of the ’816 patent and the ’390 patent place recited fare processing steps in the environment of a transit system, they differ from the representative claims of the ’003 and ’617 patents in that they contain no limitations controlling access to or otherwise linking a bankcard with a transit system. As the majority recognizes, the ’816 and ’390 patents relate generally to the processing of data and the performance of data calculations and comparisons related to the funding of transit rides using a bankcard. The inventions, as claimed, do not link such processing to the means or mechanism of regulating access to a transit system. Smart Systems argues that the ’816 and ’390 patent claims are not abstract because they solve real world problems relating to fare-processing rules despite the inability of conventional bankcards to store data. I agree. The inventions recited in the asserted claims of both of these patents are the result of human activity and facilitate the use of bankcards for a new purpose heretofore considered practically foreclosed. Regrettably, however, and for the reasons set forth in the majority opinion, our precedent leaves no room for such an argument. The claims of the ’816 patent and the ’390 patent are directed to what we have generally characterized as a “fundamental economic practice long prevalent in our system of commerce,” see Alice 134 S.Ct. at 2356. Such inventions are categorically rejected as “abstract ideas,” regardless of merit. While I disagree with such a categorical exclusion, I am bound by the precedent cited and relied on by the majority and, for that reason, am constrained to concur with the majority’s holding of patent ineligibility of the asserted claims of the ’816 and ’390 patents. . The majority objects to the terms "focus,” "thrust” and "heart” of the claims, as being inconsistent with the mandate in Alice to identify what the claims are "directed to.” Maj. Op. at 1373. Our precedent, however, has used those phrases interchangeably and faithfully to the holding of Alice. Enfish, 822 F.3d at 1335-36 ("For that reason, the first step in the Alice inquiry in this case asks whether the focus of the claims is on the specific asserted improvement in computer capabilities ... or, instead, on a process that qualifies as an 'abstract idea’ for which computers are invoked merely as a tool.”); Synopsys, 839 F.3d at 1150 ("[W]e believe our definition more accurately captures the 'basic thrust’ of the Asserted Claims.” (quoting BASCOM, 827 F.3d at 1348)); Intellectual Ventures I LLC v. Erie Indemnity Co., 850 F.3d 1315, 1328 (Fed. Cir. 2017) ("[W]e agree with the district court that the heart of the claimed invention lies in creating and using an index to search for and retrieve data.”). In each of these cases, as here, the objective was to discern—to the extent possible—what the claims at issue were “directed to.” . The majority is critical of the dissent's anal-. ysis as "conflatpng]” steps'one and two, "ignoring the Supreme Court directive that the Alice inquiry is a two-step inquiry,” Maj. Op. at 1373. While some of the step one analysis outlined above may overlap with the analysis called for in step two, our precedent recog'.nizes the inherently murky line between the two steps, See Amdocs, 841 F.3d at 1294 ("Recent .cases, however, suggest that there is considerable overlap between step one and step two, and in some situations this analysis could be accomplished without going beyond step one.”); Enfish, 822 F.3d at 1334; Elec. Pwr. Grp., LLC v. Alstom S.A., 830 F.3d 1350, 1353 (Fed. Cir. 2016) (“[T]he two stages involve overlap-ping scrutiny of the content of the claims ... there can be close questions about when the inquiry should proceed from the first stage to the second.”). Even if the boundary between steps one and two can somehow be defined—a proposition I seriously doubt, see supra at 1368—the over-arching objective of-the Alice/Mayo framework is-not the making of separate determinations under those steps but the ultimate determination of patent ineligibility under the abstract idea rubric. See Amdocs, 841 F.3d at 1294 (“Whether the more detailed analysis is undertaken at step one or at step two, the analysis presumably would be based on a generally-accepted and understood definition of, or test for, what an ‘abstract idea1 encompasses.”). The majority’s insistence on a hard line between the two steps is inconsistent with our precedent, of misplaced importance and unnecessarily rigid.